All right, good morning to Council. This has a little bit of an unusual posture since it's sort of a jurisdictional issue. And my understanding is that Mr. Sheldon is going to argue for seven minutes and Amicus Curiae, Amanda Mundell, is going to argue for eight. Is that correct? Yes, Your Honor. All right. And essentially, you're sort of both on the same side. So just, Ms. Mundell, I will promise you that you will get your eight minutes. So if we take longer with Mr. Sheldon, that's on our time. So you don't need to make frantic motions or try to pull him down from the podium if he – I'll take control of that. So you have your eight minutes, all right? Because sometimes people get worried about that if we ask additional questions. So Mr. Sheldon, why don't you state your appearance, and you've got seven minutes. There's no rebuttal on this, even though you're appellant, because we have no one to rebut. Exactly, Your Honor. May it please the Court, my name is Jeffrey Sheldon. I represent Appellant San Antonio Winery. First off, thank you for agreeing to hear this interlocutory appeal. It's discretionary, so we appreciate the Ninth Circuit agreeing to hear the case. I just have a few points to make, and I hope I don't use my seven minutes. Why did the Gallo court get it wrong? That's basically the issue in front of the court. Should we follow Gallo, or should the word proceeding – That's a district case, right? Yes. Yes. It's the case that was relied upon by Judge Wu in ruling, in this case, the embarrassment of losing an unopposed default judgment motion. So we're up here on appeal. That always can happen. Yes. You can't take anything for granted. Yes, we learned that. There were two facts. One was not before the Gallo court, and one was not considered, and that's one of the reasons Gallo got it wrong. Gallo did not have the benefit of the position of the trademark office that this court does in the amicus brief. And that takes us to the issue of deference in the Supreme Court case, the Skidmore case we cited in our supplemental materials. That's an old case, 323 U.S. 134, but it appears to be factually on point. In that case, the district court and the court of appeals, on an interpretation of a labor statute, ruled one way, the Supreme Court reversed and remanded, apparently solely because the labor department filed an amicus brief, and basically remanded to reinterpret that the district court should follow what the labor department said. So what's the deference standard? Skidmore has a lot of language about what the deference standard is, but it should be in a minimum respect. Well, the thing that's a little daunting about this case is, obviously, there's no one at the Supreme Court opposing it right now. So obviously, and no circuit has spoken on this issue. Is that correct? Correct. So, which that somewhat would be something we would consider on whether we publish on this. So I guess I want to ask you the question, why should 15 U.S.C. section 1051E be available to parties when service can be affected through the Hague Convention? Why do we give you the easy, I know Hague's harder, but it's there, so why do we give you the easy? Well, I think Congress, to protect the public, provide an easy way to deal with offshore infringers under certain circumstances, and as we made available in our materials, the Chinese government is a challenge. So we're talking, without the availability of this statute, one, two years of ongoing infringement while you're trying to affect service through the Hague Convention. So that statute is needed, and we think broad word proceeding in accordance with FRCP. So how would, put aside the facts of this case, but the rule that you're proposing here, how would that safeguard the due process rights of foreign defendants? Well, they have one option of identifying an agent of service, and that is legitimate. Applicants are going to put that in the application. Attorneys are going to want to see that. Well, I guess it's a little bit like what you're saying, it's wrong to kill, but some people need killing, so that if they didn't want to be obstreperous, then we wouldn't have to have the rule? Is that sort of what you're saying? They could just identify an agent, and they could behave as we want them to behave and make themselves available, and they're choosing not to. Well, they, in this case, chose not to be available. The issue, if you identify an agent, which can make sense, and you have a U.S. subsidiary, you might identify somebody there, or the attorney filed the application. The default on the statute is we're going to serve the commissioner of patents and trademarks. So it's an easy way out, yes, but finding an easy way out. Easy way out, do it our way? If you want to do business here, do it our way. Is that? And that makes sense. I mean, I'm a trademark attorney. I deal with some strange foreign laws all the time. I don't consider this strange. If you want to participate in the U.S. market and get a trademark registration, you open up yourself for service regarding that mark. Just so you can run, but you can't hide. Exactly. Okay. Do either of my colleagues have any questions? There's no alternate way of serving, then, for a violation like this? Well, the Hague Convention is available. And that takes a long time. A long time. One to two years, and if you're trying to stop infringement, which we were, active infringement, if you don't have this available, and if you have someone, as you say, hiding, you're going to have to deal with that infringement until the Hague Convention gets served by the Chinese government service, and then you file your motion for preliminary injunction. But this obviously doesn't come up very often, or there'd be some legislation, I guess. There aren't that very many reported cases, and generally they seem to be split even post-Gallo. We see two cases that went San Antonio's way. And I'd just like to add, San Antonio is just doing this literally in the goodness of its heart. The infringement has stopped. There is no upside. We're trying to protect the rights of U.S. companies dealing with infringers. Well, if the district courts are split, and we'd be the only circuit to speak, I think it's important for us to ascertain why this circumvents Hague, because we're putting a target on our back for the U.S. Supreme Court. So it's, my philosophy is we need to be right. I think if you go the way the San Antonio winery is requesting, you will get it right. Okay. And I doubt the Supreme Court will ever take up this issue. Right. Okay. Well, do you want to give the rest of your time to... Yes, yes. Okay. I think you'd rather hear from the Department of Justice. The Department of Justice. Okay. Thank you. So you just have an extra 27 seconds if you want. Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Amanda Mundell on behalf of the United States. If I may, I'd like to pick up with the colloquy that Your Honor was having with Mr. Sheldon about whether applying 1051E here ends up circumventing the Hague Convention in some way, or whether it's still appropriate to allow litigants to access service of process through 1051E. So I want to make clear that the Hague Convention applies only where there is no domestic service available. Now, under Rule 4, if there is an otherwise provided by law method of service available here, 1051E, then we don't have to worry about the Hague Convention's requirements being circumvented. And I think there's a number of textual clues and contextual clues that demonstrate that 1051E applies here. Well, would they, would the winery be prevented? Is there, is the Hague available to them? Can they do it that way? Yes, Your Honor. It's a, it's one of a menu of options for service. But just because the Hague Convention is available doesn't foreclose an otherwise available domestic means of service. And that would be 1051E. And as I was saying, I think there's a number of clues, both textual and contextual, that demonstrate that Congress intended Section 1051E to apply both to administrative proceedings and to court proceedings. So if we just focus in on the text for a moment, Congress used the phrase notices or process. And we think that phrase is significant because at the time the Lanham Act was enacted, the word process was understood to refer to process in a court proceeding. And of course, there is no such thing as service of process in PTO proceedings. Instead, when there's a proceeding in front of the PTO, the PTO issues notices to the parties. So if there's a notice of cancellation proceeding, that's a notice issued to the registered trademark holder, for instance. So can, since we don't have the other side here giving us counter arguments, what would be their best arguments, do you think? Frankly, Your Honor, I don't think there is a good counter argument here. You know, the Gallo is the most thorough analysis that a district court has offered. And even there, I think the court gets it wrong because it just says that each of these textual clues and contextual clues are just sources of ambiguity. But when you read them all together, the fact that Congress used the phrase notices of process, which indicates or at least suggests that Congress had in mind a court proceeding, when that's paired with the phrase proceedings affecting the mark, when it's undisputed that before the PTO. And when we think about the functionality of this provision, all of those clues together strongly suggest that Congress had both court proceedings and administrative proceedings in mind. How long does it take to get service through the Hague? You know, ordinarily, Your Honor, the Hague Convention can be a pretty efficient means. But in cases where a party seeks to serve a Chinese defendant, those procedures can take up to a year or more. So there is a policy question about whether when Congress has an efficient means of service available, whether we should use that as yet another clue that Congress intended to ensure swift and efficient means of service in court proceedings under the Lanham Act. So you're asking us to publish, I guess. And you're also asking us to say that even when service can be affected by the Hague Convention, there is someone's ability to go under 15 U.S.C. 1051e. Is that correct? That's correct, Your Honor. So if we left it, but let's just go hypothetically that we affirm the district court here. Could you explain to us the practical consequences of adopting the district court's view in this and other cases? Well, so, Your Honor, if this court determines that the district court got it right, that no litigant would be able to use 1051e as a means of serving foreign defendants. They'll always have to follow Rule 4. Now, for the most part, that will mean when there's no domestic agent available for service, that will mean that litigants will probably have to use the Hague Convention. And as I said, the Hague Convention, it's an available means of service. It works. But in circumstances such as these, it can be quite time-consuming and burdensome. But I want to give the court an example of why it doesn't make sense to read 1051e so narrowly like the district court did. And I think there's a practical functionality explanation for why it must also include court proceedings. So let's assume for a moment that 1051e applies only to administrative proceedings. If a foreign domiciliary has a domestic agent that's listed on their application for service, 1051e works fine. The USPTO can serve notices on that domestic agent, and there's no problem with 1051e. Where the problems come into play is when there is no domestic agent listed. And so the way that that works is if we assume once again that 1051e applies only to administrative proceedings, essentially what that means is the USPTO director picks up a notice and then just serves it on herself. And in administrative proceedings, that doesn't accomplish much. It's totally superfluous. But the reason why we know then that that has to contemplate court proceedings is because it does make sense when there's no domestic agent for the USPTO to receive a summons from a party and then pass that on to the domiciliary as a courtesy copy and place it in their file. So that's a practical explanation for why we know that 1051e must also include court proceedings. Well, if we rule the way you're asking us to rule, would that incentivize foreign entities to list someone domestically? Your Honor, it might. But then again, of course, foreign entities are obligated under regulation to check periodically their files to see if any electronic documents have popped up. And so they may decide that there's no one domestically that they want to pay to receive service. And that's fine because under regulation, any time the PTO has been served with a document, a courtesy copy is going to be placed in their file electronically anyway. So I don't know practically if it will incentivize that behavior. It's certainly possible. So what are the limitations on the deference we afford the Trademark Office here? Your Honor, the Trademark Office hasn't offered any authoritative interpretation in the way that Chevron or our deference would apply. Certainly, the views of the PTO are entitled to some amount of respect. But we haven't argued that deference under a greater standard ought to apply. I think the upshot is here, though, because the textual indicators and contextual indicators all point in one direction, that 1051e also includes court proceedings. There's no need to consider whether or what deference ought to apply to the PTO's views. But we can completely avoid that? That's right, Your Honor. We don't appear to have any additional questions. You still have a little bit of time to wrap up if there's anything else you want to say. That's it for me, Your Honor. We just asked that the court reverse. Or you could snatch defeat from the jaws of victory if you want to keep going. I will submit, Your Honor. I appreciate your time. Thank you very much. All right. Thank you both for your arguments in this matter. It will stand submitted.
judges: Siler, CALLAHAN, THOMAS